1    ROBBINS ARROYO LLP
     BRIAN J. ROBBINS (#190264)
2    brobbins@robbinsarroyo.com
     STEPHEN J. ODDO (#174828) .
3    soddo@robbinsarroyo.com
     ARSHAN AMIRI (#246874)
4    aamiri@robbinsarroyo.com
     EDWARD B. GERARD (#248053)
5    egerard@robbinsarroyo.com
     JUSTIN D. RIEGER (#257321)
6    jrieger@robbinsarroyo.com
     600 B Street, Suite 1900
7    San Diego, CA 92101
     Telephone: (619) 525-3990
8    Facsimile: (619) 525-3991

9    Attorneys for Plaintiff

10   [Additional Counsel on Signature Page]

FILED

FEB 22 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

11              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
12              SAN FRANCISCO DIVISION

JST
C 13    0827

13   IRON WORKERS MID-SOUTH            ) Case No.
     PENSION FUND, on Behalf of Itself and )
14   All Others Similarly Situated,      )
                                         )
15              Plaintiff,               ) CLASS ACTION COMPLAINT FOR
                                         ) VIOLATIONS OF THE SECURITIES
16        v.                             ) EXCHANGE ACT OF 1934 AND
                                         ) OPPRESSION
17   FOCUS MEDIA HOLDING LIMITED,        )
     JASON NANCHUN JIANG, KIT           )
18   LEONG LOW, NEIL NANPENG SHEN,       )
     FUMIN ZHUO, CHARLES GUO WEI        )
19   CAO, DAQING QI, DAVID YING         )
     ZHANG, YING WU, GIOVANNA           )
20   PARENT LIMITED, and GIOVANNA       )
     ACQUISITION LIMITED,               )
21                                       )
                Defendants.              )
22   _____)

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND
OPPRESSION

**SUMMARY OF THE ACTION**

1.    Plaintiff Iron Workers Mid-South Pension Fund ("Plaintiff") brings this shareholder class action both for itself, and on behalf of all similarly situated holders of Focus Media Holding Limited ("Focus Media" or the "Company") common stock against Focus Media, the members of the Company's Board of Directors (the "Board" or the "Individual Defendants"), Giovanna Parent Limited ("Giovanna"), and Giovanna Acquisition Limited ("Merger Sub").[1] This action arises out of Defendants' violations of the Cayman Islands Companies Law (2012 Revision) (the "Companies Law") and sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder. These violations arose in connection with Defendants' attempts to sell Focus Media to Giovanna for an inadequate price of $5.50 per share (or $27.50 per American depository share ("ADS")) following an unfair process (the "Proposed Transaction").[2] Further, as part of their efforts to seek shareholder approval of the Proposed Transaction, Defendants filed a false and materially misleading Form SC 13E-3 transaction statement with the SEC (the "Proxy").

2.    Under the laws of the Cayman Islands, directors of publicly traded corporations must avoid conducting the affairs of a company in a manner which is oppressive or otherwise prejudicial to shareholders.  In pursuing the unlawful plan to sell the Company via an unfair process and at an inadequate price, the Individual Defendants acted in a manner prejudicial and/or oppressive to Focus Media shareholders and, thereby, violated Cayman Islands corporate law. Likewise, Defendants violated section 14(a) and 20(a) of the Exchange Act by attempting to facilitate the consummation of the Proposed Transaction without fairly and adequately disclosing to shareholders all material information.  This action seeks to enjoin the Individual Defendants

---

[1] The Board is comprised of defendant Jason Nanchun Jiang ("Jiang" or the "Chairman"), Kit Leong Low ("Low"), Neil Nanpeng Shen ("Shen"), Fumin Zhuo ("Zhuo"), Charles Guo Wei Cao ("Cao"), Daqing Qi ("Qi"), David Ying Zhang ("Zhang"), and Ying Wu ("Wu").  The Board, Giovanna, and Merger Sub are collectively referred to herein as "Defendants."

[2] Each ADS represents five ordinary shares of Focus Media common stock.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND OPPRESSION

1  from further violating the laws of both the United States and the Cayman Islands in connection
2  with the Proposed Transaction.

3      3.     Focus Media is China's largest lifestyle targeted interactive digital media network
4  operator, with the largest out-of-home audiovisual display advertising network in the country.
5  Founded in 2003, the Company is devoted to building an increasingly comprehensive and
6  measurable interactive, multi-platform, digital media network that reaches consumers at various
7  out-of-home locations. In addition to operating the largest LCD display network in China, the
8  Company's advertising media platforms expand into the poster frame network, in-store network,
9  movie theater advertising network, and traditional outdoor billboard network. Since its inception,
10  Focus Media has experienced significant growth, expanding its LCD display network to eighty-one
11  major cities, and thirty-three smaller cities, throughout China.

12      4.     Given its size and market share, it is no surprise that the Company has experienced
13  stable and robust financial performance in recent years, beating earnings per share ("EPS")
14  estimates in each of the last nine quarters and sales estimates in seven of the last eight. Likewise,
15  in the third quarter of 2012, the Company saw net revenues from its poster frame and movie
16  theater networks increase by 75% (to $81.6 million) and 78% (to $23.2 million), respectively, over
17  the same quarter in 2011. Remarkably, these positive results came at a time when, according to
18  defendant Jiang, Focus Media's Chairman and Chief Executive Officer ("CEO"), the Company was
19  facing "macroeconomic uncertainties" which were impacting "overall advertising spending in
20  China." The Company's ability to prosper even in this somewhat tough environment is a sign of
21  Focus Media's strength and potential for growth. Indeed, defendant Jiang acknowledged that the
22  Company's "media platform remain[s] strong and robust" and that the Company was poised to
23  "weather th[ose] challenges" facing the industry.

24      5.     Unfortunately, on December 19, 2012, the Board issued a press release announcing
25  the Proposed Transaction, bringing the ability of Focus Media's shareholders to benefit from the
26  Company's exceedingly bright future to an immediate halt. In agreeing to the Proposed
27  Transaction, the Board acted in an unfairly prejudicial and oppressive manner by failing to conduct
28  a full and fair sales process designed to secure the best value available for the Company's

- 2 -

1   shareholders. Indeed, the Board negotiated exclusively with Giovanna – an entity which is

2   affiliated with Focus Media insider, defendant Jiang – specifically deciding not to engage in an

3   active shopping process. Moreover, it agreed to accept the inadequate price of $27.50 per

4   Company ADS (the "Proposed Consideration") which represents a mere 15% premium to the

5   closing price of Focus Media's ADS on December 18, 2012 – the day prior to the announcement of

6   the Proposed Transaction – and implies an equity value for the Company of just $3.7 billion. The

7   Proposed Consideration is also well below the $31.50 to $46 per ADS price targets set by

8   numerous analysts covering the Company in the months preceding the announcement of the

9   Proposed Transaction. Even Focus Media's financial advisor, J.P. Morgan Securities (Asia

10  Pacific) Limited ("JP Morgan"), had to manipulate its analyses concerning the Company's value in

11  order to create the false impression that the Proposed Consideration is fair, from a financial point

12  of view, to Focus Media shareholders.

13          6.      In order to ensure that Giovanna's attempt to acquire the Company on the cheap was

14  not disturbed, the Board agreed to include a number of preclusive deal protection devices in the

15  December 19, 2012 Agreement and Plan of Merger (the "Merger Agreement") entered into in

16  connection with the Proposed Transaction. These provisions, which collectively preclude any

17  competing offers for Focus Media, include: (i) a no-solicitation provision prohibiting the Company

18  from properly shopping itself; (ii) a $40 million termination fee payable by the Company to

19  Giovanna if an unsolicited superior offer materializes and is ultimately accepted; and (iii) a five-

20  day matching rights period during which Giovanna can match any superior proposal received by

21  the Company. Moreover, as part of their unlawful plan to strip Focus Media shareholders of their

22  right to receive maximum value for their shares, certain of the directors and officers of the

23  Company (along with their respective affiliates) entered into voting agreements with other large

24  Focus Media shareholders pursuant to which they agreed to vote their collective shares (amounting

25  to approximately 36.27% of the total shares outstanding) in favor of the Proposed Transaction and

26  against any alternative proposal (the "Voting Agreement").

27          7.      Finally, on January 18, 2013, Defendants filed the false and materially misleading

28  Proxy with the SEC. The Proxy, which recommends that Focus Media shareholders vote in favor

- 3 -

1  of the Proposed Transaction, omits and/or misrepresents material information in contravention of
2  sections 14(a) and 20(a) of the Exchange Act regarding: (i) the unfair sales process for the
3  Company; and (ii) the financial analyses prepared by JP Morgan in connection with the rendering
4  of its fairness opinion, including the data and key inputs underlying such analyses. This omitted
5  and/or materially misrepresented information precludes Focus Media shareholders from making a
6  fully-informed decision whether to vote in favor of the Proposed Transaction. As such,
7  Defendants' Exchange Act violations threaten shareholders with irreparable harm for which money
8  damages are not an adequate remedy. Accordingly, Plaintiff seeks injunctive and other equitable
9  relief designed to ensure that Defendants cure their violations of federal securities law, and
10 therefore Cayman Islands laws concerning oppression, before the shareholder vote in connection
11 with the Proposed Transaction takes place in the coming months.

12        8.       Specifically, Plaintiff seeks: (i) injunctive relief preventing consummation of the
13 Proposed Transaction, unless and until the Company adopts and implements a procedure or
14 process to obtain a transaction that provides the best possible terms for shareholders, and
15 Defendants disclose all material information concerning the Proposed Transaction to Focus Media
16 shareholders; (ii) a directive to the Individual Defendants to comply with their duties under
17 applicable law by obtaining a transaction which is in the best interests of Focus Media
18 shareholders; and (iii) rescission of, to the extent already implemented, the Merger Agreement or
19 any of the terms thereof.

20                          **JURISDICTION AND VENUE**

21        9.       This Court has jurisdiction over all claims asserted herein pursuant to section 27 of
22 the Exchange Act for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule
23 14a-9 promulgated thereunder. This Court has jurisdiction over the subject matter of this action
24 pursuant to 28 U.S.C. §1331. This Court has supplemental jurisdiction pursuant to 28 U.S.C.
25 §1367(a) over all other claims that are so related to claims in the action within such original
26 jurisdiction that they form part of the same case or controversy under Article III of the United
27 States Constitution. Venue is likewise proper in this Court in accordance with 28 U.S.C. §1391(a)
28

- 4 -

1  because one or more of the Defendants either resides in or maintains executive offices in this
2  District.

3                              **INTRADISTRICT ASSIGNMENT**

4          10.    This action is properly assigned to the San Francisco division of this Court.

5                                      **PARTIES**

6          11.    Plaintiff Iron Workers Mid-South Pension Fund is, and has been, a shareholder of
7  Focus Media at all relevant times.

8          12.    Defendant Focus Media is a Cayman Islands corporation with principal executive
9  offices located at Unit No. 1, 20th Floor, The Centrium, 50 Wyndham Street, Central, Hong Kong.
10 Focus Media is China's leading multi-platform digital media company, operating the largest LCD
11 display network in China using audiovisual digital displays in commercial and residential
12 locations. Focus Media operates in five networks including the LCD display network, poster
13 frame network, in-store network, movie theater advertising network, and traditional outdoor
14 billboards. Since its business commenced in May 2003, Focus Media has experienced significant
15 growth in its networks and in its financial results. As of December 31, 2011, Focus Media
16 operated its LCD display network directly in eighty-one major cities throughout China as well as
17 thirty-three additional cities through contractual arrangements with regional distributors. Upon
18 completion of the Proposed Transaction, the Company will become a wholly owned subsidiary of
19 Giovanna, which in turn will be owned by defendant Jiang and several other entities.

20         13.    Defendant Jiang is Focus Media's CEO and has been since January 2009 and
21 Chairman and has been since May 2003. Defendant Jiang was also Focus Media's CEO from May
22 2003 to March 2008. Defendant Jiang is Focus Media's founder. Upon completion of the
23 Proposed Transaction, defendant Jiang will continue to serve as CEO and Chairman of the board
24 of directors of the surviving company, and will also become a beneficial owner of defendant
25 Giovanna.

26         14.    Defendant Low is Focus Media's Chief Financial Officer and has been since
27 January 2010 and a director and has been since May 2011. Upon completion of the Proposed

28
                                          - 5 -

1 | Transaction, defendant Low is expected to continue to serve as Chief Financial Officer of the
2 | surviving company.

3 |     15.     Defendant Shen is a Focus Media director and has been since December 2004.

4 |     16.     Defendant Zhuo is a Focus Media director and has been since December 2004.

5 |     17.     Defendant Cao is a Focus Media director and has been since November 2005.

6 |     18.     Defendant Qi is a Focus Media director and has been since February 2006.

7 |     19.     Defendant Zhang is a Focus Media director and has been since September 2007.

8 |     20.     Defendant Wu is a Focus Media director and has been since May 2008.

9 |     21.     Defendant Giovanna is a Cayman Islands exempted company and a wholly owned
10 | subsidiary of Giovanna Intermediate Limited, which is a wholly owned subsidiary of Giovanna
11 | Group Holdings Limited, a company formed for the purpose of consummating certain transactions
12 | in connection with the Proposed Transaction. Upon completion of the Proposed Transaction,
13 | defendant Giovanna will become beneficially owned by the Acquiring Consortium (as defined
14 | herein).

15 |     22.     Defendant Merger Sub is a Cayman Islands exempted company and a wholly
16 | owned subsidiary of defendant Giovanna. Upon completion of the Proposed Transaction, Merger
17 | Sub will be merged with and into defendant Focus Media and cease its separate corporate
18 | existence.

19 | **THE INADEQUATE SALES PROCESS**

20 |     23.     Seizing the opportunity to liquidate his nearly 18.5% interest in the Company while
21 | simultaneously securing lucrative employment with, and an equity stake in, the post-transaction
22 | entity, defendant Jiang and his wholly-owned companies (collectively the "Chairman Parties")[3]

23 |
24 |
25 | _____

26 | [3] The "Chairman Parties" include the Chairman, JJ Media Investment Holding Limited ("JJ
    | Media"), Target Sales International Limited ("Target Sales"), Top Notch Investments Holdings
27 | Ltd. ("Top Notch"), and Target Management Group Limited ("Target Management").

28 |

1   joined forces with the Sponsor Group[4] to take Focus Media private through the Proposed
2   Transaction.[5] Unfortunately, the Individual Defendants failed to conduct a sales process designed
3   to ensure that Company shareholders received maximum value for their Focus Media stock in
4   connection with the Proposed Transaction. Instead, they negotiated exclusively with the Acquiring
5   Consortium, refusing to engage in any semblance of a market check or otherwise encourage a
6   competitive bidding process.

7        24.    Between March and July of 2012, defendant Jiang was independently approached
8   by FountainVest, Carlyle, CITIC, and Everbright regarding his interest in making a joint-bid to
9   acquire the Company in a going-private transaction. Without explaining how these entities
10   became aware of one another's respective desires to acquire Focus Media, the Proxy states that the
11   Sponsor Group was formed to pursue acquisition related discussions with the Company toward the
12   end of this timeframe.

13        25.    Defendant Jiang informed the other members of the Board of the expressions of the
14   interest received from the Sponsor Group and, feigning a lack of interest in personally participating
15   in any such transaction, suggested that it "might present an attractive alternative to the Company's
16   shareholders." Based on this representation from the Company's founder and long-time Chairman,
17   and without any input from its legal or financial advisors, the Board promptly decided to allow the
18   Sponsor Group to engage in due diligence of Focus Media.

19        26.    Having successfully set the sales process in motion, defendant Jiang teamed-up
20   with the other members of the Sponsor Group in early August of 2012 in an effort to acquire Focus
21   Media. In fact, he entered into an agreement pursuant to which he was obligated to work
22   exclusively with the Sponsor Group through August 12, 2013 – thereby preventing him from fairly

23   _____

24   [4] The "Sponsor Group" is comprised of Carlyle Asia Partners III, L.P. ("Carlyle"), FountainVest
25   China Growth Capital Fund II, L.P. ("FountainVest"), CITIC Capital China Partners II, L.P.
      ("CITIC"), and China Everbright Structured Investment Holdings Limited ("Everbright").

26   [5] The Chairman Parties and the Sponsor Group are collectively referred to herein as the "Acquiring
27   Consortium."

28

- 7 -

considering any competing proposal to acquire the Company which he received in his role as Focus Media's Chairman, and significantly undermining the ability of the Board to run a competitive sales process.

27.     In order to ensure that its anticipated going-private proposal would receive the necessary shareholder approval, the Acquiring Consortium reached out to Fosun International Limited ("Fosun") – Focus Media's second largest shareholder (behind defendant Jiang) owning approximately 16.8% of its common shares – in late-June of 2012 to discuss whether it would agree to vote in favor of a going private proposal in exchange for an ownership interest in the post-transaction entity.[6] While Fosun refused to enter into any such agreement at that time, it did indicate that it would be willing to consider any going private proposal the Acquiring Consortium submitted to the Board.[7]

28.     Having warmed Fosun to the idea of a going-private transaction, the Acquiring Consortium turned its efforts toward making an offer to the Company. On August 12, 2012, the Acquiring Consortium finalized its preliminary, non-binding proposal to acquire the Company for $5.40 per share (or $27 per ADS) (the "Initial Proposal") and prepared it for submission to the Board.

29.     Defendant Jiang convened a meeting of the Board later that day in order to officially submit the Initial Proposal on behalf of himself and the Sponsor Group and, the following day, he provided the Board with an overview of the Initial Proposal and its terms. At no time during either of these meetings did the Board discuss whether the individual members of the Sponsor Group should be allowed to pursue a joint acquisition or whether it was in the best interest of shareholders to engage in a more competitive bidding process by requiring the respective entities to submit separate proposals.

---

[6] No acquisition proposal had even been submitted to the Board at this time, demonstrating that the Acquiring Consortium was confident that an acquisition would ultimately be agreed to and the bigger concern was ensuring that it would have the shareholder support necessary for approval.

[7] Fosun ultimately joined the Acquiring Consortium in mid-October 2012.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND OPPRESSION

1        30.    On the afternoon of August 13, 2012, Focus Media issued a press release disclosing
2 its receipt of the Initial Proposal and the detailing its terms. Fosun subsequently issued a press
3 release of its own, indicating that it would not support any competing proposals to acquire the
4 Company unless they included defendant Jiang as a participant. The Proxy fails to disclose why
5 Fosun, who would be cashed out under the terms of the Initial Proposal, would concern itself with
6 who acquired the Company. In fact, the only thing Fosun's press release did was ensure that no
7 competing proposals would be submitted, further evidencing the inadequacy of the sales process
8 underlying the Proposed Transaction.

9        31.    Over the ensuing month, the special committee formed by the Board in connection
10 with its receipt of the Initial Proposal (the "Special Committee") sat idly by while the Acquiring
11 Consortium continued to aggressively conduct its due diligence of the Company. Despite having
12 engaged JP Morgan to serve as its financial advisor, the Special Committee did not authorize it to
13 actively shop the Company or in any way solicit the interest of other parties in potentially
14 acquiring the Company. In fact, on September 17, 2012, the Special Committee and JP Morgan
15 decided they "would not pursue an active market check," opting instead to negotiate exclusively
16 with the conflicted Acquiring Consortium.

17        32.    With no realistic threat of a competing bid emerging, the Acquiring Consortium
18 was in the position to, and did, control the so-called "negotiation" process with the Special
19 Committee. Indeed, within just three months of the Acquiring Consortium circulating its initial
20 draft of the proposed merger agreement on September 21, 2012, the Proposed Transaction was
21 finalized and the Merger Agreement was executed and approved by the Board on terms nearly
22 identical to those contained in the Initial Proposal.

23                       **THE PROPOSED TRANSACTION**

24        33.    On December 19, 2012, Focus Media issued a press release announcing that the
25 Individual Defendants had agreed to sell the Company to Giovanna for $5.50 per Focus Media
26 share (or $27.50 per Company ADS). The press release stated, in relevant part, as follows:

27

28

- 9 -

1    SHANGHAI, Dec. 19, 2012 /PRNewswire/ -- Focus Media Holding Limited (the
2    "Company" or "Focus Media") (Nasdaq: FMCN) announced today that it has entered
     into a definitive Agreement and Plan of Merger (the "Merger Agreement") with
3    Giovanna Parent Limited ("Parent") and Giovanna Acquisition Limited ("Merger
4    Sub"), pursuant to which Parent will acquire Focus Media (the "Transaction") for
     US$5.50 per ordinary share of the Company (a "Share") or US$27.50 per American
5    depositary share, each representing five Shares (an "ADS"). This amount represents a
     premium of 17.6% over the Company's closing price of US$23.38 per ADS on
6    August 10, 2012, the last trading day prior to August 13, 2012, the date that the
     Company announced it had received a "going-private" proposal, and a premium of
7    36.6% and 33.9% to the volume weighted average closing price of the Company's
     ADSs during the 30 and 60 trading days prior to August 13, 2012, respectively. The
8    Transaction values Focus Media's equity at approximately US$3.7 billion, on a fully
     diluted basis.
9
     Immediately after the completion of the Transaction, Parent will be beneficially
10   owned by Jason Nanchun Jiang, the Chairman and Chief Executive Officer of the
     Company (the "Chairman"); affiliates of and funds managed by Giovanna Investment
11   Holdings Limited, an entity owned and controlled by Carlyle Asia Partners III, L.P.;
12   Gio2 Holdings Ltd., an entity owned and controlled by FountainVest China Growth
     Capital Fund, L.P., FountainVest China Growth Capital Fund II, L.P., their
13   respective parallel funds and affiliates; Power Star Holdings Limited, an entity
     owned and controlled by CITIC Capital China Partners II, L.P.; and State Success
14   Limited, an entity owned and controlled by affiliates of China Everbright Structured
     Investment Holdings Limited. In addition, Fosun International Limited and/or its
15   affiliates ("Fosun") will become a beneficial owner of Parent after the Transaction is
16   completed. The Chairman and Fosun, collectively, currently beneficially own, in the
     aggregate, approximately 35.5% of the outstanding Shares (excluding outstanding
17   options and restricted share units of the Company).

18   Subject to the terms and conditions of the Merger Agreement, at the effective time of
     the merger (the "Effective Time"), Merger Sub will merge with and into the
19   Company, with the Company continuing as the surviving corporation and a wholly
20   owned subsidiary of Parent. Pursuant to the Merger Agreement, each Share issued
     and outstanding immediately prior to the Effective Time will be cancelled and cease
21   to exist in exchange for the right to receive US$5.50 in cash without interest and net
     of any applicable withholding taxes, and each ADS issued and outstanding
22   immediately prior to the Effective Time will represent the right to surrender the ADS
     in exchange for US$27.50 in cash without interest and net of applicable withholding
23   taxes, other than (i) a portion of the Shares beneficially owned by the Chairman and
24   Fosun immediately prior to the Effective Time, which will be rolled over in the
     Transaction, and (ii) Shares owned by shareholders who shall have validly exercised
25   and not effectively withdrawn or lost their rights to dissent from the Transaction
     under the Cayman Companies Law, which Shares will be cancelled at the Effective
26   Time for the right to payment of the appraised value of such Shares in accordance
     with the Cayman Companies Law. Shares owned by the Company or its subsidiaries
27   and Shares reserved (but not yet allocated) by the Company for settlement upon
28

                                        - 10 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

exercise of any share incentive awards issued under the Company's employee share incentive plans will all be cancelled for no consideration at the Effective Time.

The Company's Board of Directors, acting upon the unanimous recommendation of an independent committee of the Board of Directors (the "Independent Committee"), approved the Merger Agreement and the Transaction and resolved to recommend that the Company's shareholders vote to authorize and approve the Merger Agreement and the Transaction. The Independent Committee negotiated the terms of the Merger Agreement with the assistance of its financial and legal advisors.

Under the terms of the Merger Agreement, the Company is not permitted to pay any dividends or repurchase any of its Shares pending consummation of the Transaction. As a result, the Company's board of directors has suspended the Company's previously announced share repurchase program and dividend policy.

The Transaction, which is currently expected to close during the second quarter of 2013, is subject to various closing conditions, including a condition that the Merger Agreement be authorized and approved by an affirmative vote of shareholders representing two-thirds or more of the Shares present and voting in person or by proxy as a single class at a meeting of the Company's shareholders convened to consider the authorization and approval of the Merger Agreement. The Chairman, Fosun and certain members of the Company's senior management team have agreed to vote all of the Shares they beneficially own, which represent approximately 36.0% of the outstanding Shares (excluding outstanding options and restricted share units of the Company), in favor of the authorization and approval of the Merger Agreement and the Transaction. If completed, the Transaction will result in the Company becoming a privately-held company and its ADSs will no longer be listed on the NASDAQ Global Market.

Merger Sub has entered into a debt commitment letter pursuant to which Bank of America, N.A., China Development Bank Corporation Hong Kong Branch, China Minsheng Banking Corp., Ltd Hong Kong Branch, Citibank, N.A., Citigroup Global Markets Asia Limited, Credit Suisse AG, Singapore Branch, DBS Bank Ltd., Deutsche Bank AG, Singapore Branch, ICBC International Capital Limited, ICBC International Holdings Limited, UBS AG Hong Kong Branch and UBS AG, Singapore Branch have agreed as underwriters, bookrunners and/or mandated lead arrangers to arrange and/or provide or underwrite (themselves or through their affiliates) US$1.525 billion in the aggregate of debt financing for the Transaction, subject to certain conditions.

The Company will prepare and file with the U.S. Securities and Exchange Commission (the "SEC") a Schedule 13E-3 transaction statement, which will include a proxy statement of the Company. The Schedule 13E-3 will include a description of the Merger Agreement and contain other important information about the Transaction, the Company and the other participants in the Transaction.

J.P. Morgan Securities (Asia Pacific) Limited is serving as financial advisor to the Independent Committee. Kirkland & Ellis is serving as U.S. legal advisor to the

- 11 -

Independent Committee, and Maples and Calder and Fangda Partners are serving as Cayman Islands and PRC legal advisor to the Independent Committee, respectively. Simpson Thacher & Bartlett is serving as U.S. legal advisor to the Company. Shearman & Sterling LLP is serving as U.S. legal advisor to J.P. Morgan Securities (Asia Pacific) Limited.

Citigroup Global Markets Inc. and Credit Suisse (Hong Kong) Limited are serving as lead M&A financial advisors to the private equity sponsor group (the "Sponsors") in respect of the Transaction, with Deutsche Bank AG, ICBC International Capital Limited, Merrill Lynch (Asia Pacific) Limited and UBS AG serving as financial advisors. Fried, Frank, Harris, Shriver & Jacobson LLP and Sullivan & Cromwell are serving as U.S. legal advisors to the Sponsors, Sullivan & Cromwell is advising on English law matters and Conyers Dill & Pearman and Zhong Lun Law Firm are serving as Cayman Islands and PRC legal advisor to the Sponsors, respectively. Skadden, Arps, Slate, Meagher & Flom LLP is serving as U.S. legal advisor to the Chairman. Clifford Chance is serving as U.S. and English law legal advisor to the underwriters, bookrunners and mandated lead arrangers of the debt financing and Walkers and Fangda Partners are serving as Cayman Islands legal advisor and PRC legal advisor, respectively, to the underwriters, bookrunners and mandated lead arrangers of the debt financing.

34. The press release went on to state that, as part of their efforts to seek shareholder approval of the Proposed Transaction, Focus Media and the Individual Defendants would be filing with the SEC both a proxy statement and a Schedule 13E-3. This press release stated, in relevant part, as follows:

In connection with the proposed Transaction, the Company will prepare and mail a proxy statement that will include a copy of the Merger Agreement to its shareholders. In addition, certain participants in the proposed Transaction will prepare and mail to the Company's shareholders a Schedule 13E-3 transaction statement that will include the Company's proxy statement. These documents will be filed with or furnished to the SEC. *INVESTORS AND SHAREHOLDERS ARE URGED TO READ CAREFULLY AND IN THEIR ENTIRETY THESE MATERIALS AND OTHER MATERIALS FILED WITH OR FURNISHED TO THE SEC WHEN THEY BECOME AVAILABLE, AS THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE COMPANY, THE PROPOSED TRANSACTION AND RELATED MATTERS.* In addition to receiving the proxy statement and Schedule 13E-3 transaction statement by mail, shareholders also will be able to obtain these documents, as well as other filings containing information about the Company, the proposed Transaction and related matters, without charge, from the SEC's website (http://www.sec.gov) or at the SEC's public reference room at 100 F Street, NE, Room 1580, Washington, D.C. 20549.

- 12 -

1

## THE PRECLUSIVE DEAL PROTECTION DEVICES

2      35.      On December 21, 2012, the Company filed a Schedule 13D/A with the SEC
3  wherein it disclosed the Merger Agreement. The Merger Agreement reveals that the Board agreed
4  to numerous draconian deal protection devices designed to preclude any competing bids for the
5  Company.

6      36.      Section 6.04(a) of the Merger Agreement subjects the Company to a strict no-
7  solicitation clause that prohibits it from seeking a superior offer for its shareholders. Though the
8  Merger Agreement ostensibly has a "fiduciary out" provision that allows the Company to negotiate
9  with other bidders, it may only do so in the unlikely event that the potential acquirer, without the
10  benefit of non-public information, first makes an "unsolicited, written, bona fide proposal or offer"
11  that constitutes, or is reasonably expected to lead to, a superior proposal.

12      37.      Moreover, it is unknown whether the parties most likely to make such a superior
13  proposal (i.e., those that had previously entered into a confidentiality agreement with the
14  Company) would even be able to submit any offers, because this provision also prevents the
15  Company from releasing any party from, or waiving any provision of, a confidentiality or
16  standstill agreement to which it is a signatory.  Thus, depending on the specific terms of such
17  agreements, precluding those entities which had previously expressed an interest in acquiring the
18  Company would be precluded from submitting a competing acquisition proposal even at a price
19  which exceeds the $27.50 per Focus Media ADS offered in the Proposed Transaction.

20      38.      The likelihood of another offer emerging is even further reduced by section 6.05(c)
21  of the Merger Agreement which conveys upon Giovanna unlimited information and matching
22  rights in the event that a superior proposal is ultimately received by the Company. This matching
23  rights provision requires the Company to disclose the terms of any potentially superior proposal to
24  Giovanna within forty-eight hours of it being received and mandates that Focus Media negotiate in
25  good-faith with Giovanna for at least five business days concerning a counter offer that need only
26  be as favorable as the competing superior proposal.  Given Giovanna's right to match any
27  competing offer, a rival bidder is even less likely to emerge.

28

- 13 -

1      39.    Section 8.03 of the Merger Agreement further subjects the Company to another
2 preclusive deal-protection provision in the form of a $40 million termination fee payable to
3 Giovanna should a superior proposal ultimately be accepted. This provision also requires the
4 Company to reimburse Giovanna for up to $6 million of its expenses incurred in connection with
5 the Proposed Transaction.

6      40.    In addition to these preclusive deal protection devices, there are a number of other
7 factors which all but guarantee that no alternative bids will materialize for the Company, including
8 the fact that: (i) defendant Jiang and Fosun – who own 18.5% and 16.82% of Focus Media's shares
9 – are both part of the Acquiring Consortium; (ii) defendant Jiang has agreed to work exclusively
10 with the Sponsor Group until August 13, 2013 (well after the Proposed Transaction is set to be
11 consummated); (iii) defendant Jiang and Fosun have publicly stated, on multiple occasions both
12 before and after joining the Acquiring Consortium, that they would not entertain alternative
13 acquisition proposals; and (iv) certain of the directors, officers, and shareholders of the Company
14 have entered into the Voting Agreement pursuant to which they are required to vote the 36.27% of
15 the Company's common shares that they beneficially own in favor of the Proposed Transaction and
16 against any alternative proposals.

17      41.    The Individual Defendants' decision to lock-up the Proposed Transaction in favor of
18 the Acquiring Consortium is all the more egregious when considering the inability of the
19 Company's shareholders to mount any real opposition to the transaction. Indeed, as if overcoming
20 the existence of the Voting Agreement weren't already difficult enough, the holders of the
21 Company's common stock and ADSs will all be deemed to have voted in favor of the Proposed
22 Transaction *unless* they submit a proxy with a definitive "AGAINST" vote. Shareholders who
23 abstain from voting or improperly fill out their proxy card are inexplicably treated as if they voted
24 "FOR" the Proposed Transaction. Accordingly, unless over 34% of the shares not already locked
25 up are voted against the Proposed Transaction, it will be consummated. This is true regardless of
26 whether a majority of the shares unaffiliated with the Acquiring Consortium vote in favor of the
27 acquisition.

28

- 14 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND
OPPRESSION

1    42.    To make matters worse, the ADS shareholders do not have dissenter rights. In fact,
2  the Proxy expressly states that the holders of the Company's ADSs will not be able to institute
3  appraisal proceedings or otherwise seek "payment of the fair value of the shares underlying their
4  ADSs." Likewise, the ability of the Company's common shareholders to seek appraisal is severely
5  limited as they must first deliver a written objection to the Proposed Transaction and then comply
6  with a myriad other requirements as proscribed in the Companies Law.

7    43.    Collectively, these onerous and preclusive provisions and agreements, which will
8  serve to unreasonably deter and discourage superior offers from other interested parties and ensure
9  the acquisition of the Company by the Acquiring Consortium, were agreed to by the Individual
10  Defendants to help secure the personal benefits and unfair profits afforded to them through the
11  Proposed Transaction and all but ensure that no other bidder steps forward to submit a superior
12  proposal.

13                    **FAILURE TO MAXIMIZE SHAREHOLDER VALUE**

14    44.    In order to satisfy their duties and obligations to Focus Media shareholders, the
15  Individual Defendants are obligated to explore transactions that will maximize shareholder value,
16  and not structure a preferential deal for themselves. Here, however, the Individual Defendants
17  refused to engage in any semblance of a sales process, choosing instead to negotiate exclusively
18  with its preferred bidder, Giovanna. Accordingly, the sales process failed to result in Company
19  shareholders receiving the maximum price available for their shares or ADSs. Indeed, the
20  Proposed Consideration offered by Giovanna fails to reflect the true inherent value of the
21  Company as known to the Individual Defendants, JP Morgan, and Giovanna (as well as various
22  industry analysts) at the time the Proposed Transaction was announced.

23    45.    The Proposed Consideration of $27.50 per ADS represents a mere 15% premium to
24  the price at which Focus Media stock was trading prior to the announcement of the Proposed
25  Transaction on December 19, 2012. This is entirely inadequate for acquiring an entity like Focus
26  Media that has demonstrated historically stable, yet increasing, financial results and is poised for
27
28

- 15 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND
OPPRESSION

1 | significant future growth.[8] Indeed, the Company has beaten analyst EPS and sales estimates in all
2 | but one of the last eight quarters while growing its third quarter of 2012 net revenues from its
3 | poster frame and movie theater networks by 75% (to $81.6 million) and 78% (to $23.2 million),
4 | respectively, over the same quarter in the previous year.

5 |     46.    Given the foregoing, it is no surprise that multiple analysts valued Focus Media
6 | ADSs at amounts exceeding the Proposed Consideration. For example: (i) analysts with Riedel
7 | Research Group Inc. set a price target of $46 per ADS on June 6, 2012, and did not adjust that
8 | figure even after the Proposed Transaction was announced; (ii) analysts with Macquarie set a price
9 | target of $43 per ADS on November 28, 2012, and did not adjust that figure even after the
10 | Proposed Transaction was announced; and (iii) analysts with GuoSen Securities Co. Ltd. set a
11 | price target of $31.50 per ADS on March 21, 2012, and did not adjust that figure even after the
12 | Proposed Transaction was announced. Even analysts with the Company's own financial advisor,
13 | JP Morgan, had a $36 per ADS price target on the Company at the time the Initial Proposal was
14 | publicly announced.

15 |     47.    A good look at the financial analyses prepared by JP Morgan in connection with the
16 | rendering of its fairness opinion further reveals the inadequacy of the Proposed Consideration (and
17 | explains why JP Morgan's research analysts valued the Company at over 30% more per ADS than
18 | its investment banker's deemed to be appropriate). Despite being retained as the Special
19 | Committee's financial advisor in August of 2012, JP Morgan was not authorized to, nor did it,
20 | solicit any expressions of interest from third parties with respect to the sale of the Company.
21 | Instead, it was retained to merely rubber-stamp whatever agreement the Special Committee
22 | reached with the Acquiring Consortium, with a fairness opinion.

23 |     48.    As JP Morgan's engagement letter called for it to receive $2 million just for
24 | rendering its fairness opinion (with additional payments of up to $1 million payable following the

25 | _____

26 | [8] In its fairness opinion, JP Morgan even admits that "precedent privatization premiums for
27 | Cayman-incorporated PRC companies listed in the U.S. over the last trading day prior to announcement of a privatization offer ranges from 17% to 34%...."

28 |

- 16 -

1  consummation of the Proposed Transaction), it had every incentive to make the Proposed
2  Consideration appear fair – despite all the evidence to the contrary – so that it could render a
3  positive fairness opinion and collect its fee. And that is precisely what it did.

4      49.    Indeed, JP Morgan had to significantly manipulate the financial analyses it
5  performed in connection with the rendering of its fairness opinion in order to create the appearance
6  that the Proposed Consideration was fair to Focus Media shareholders. Specifically, JP Morgan
7  made certain questionable adjustments, and relied upon some entirely unjustifiable assumptions, in
8  connection with the preparation of its Public Trading Multiples, Selected Transaction, and
9  Discounted Cash Flow ("DCF") Analyses which resulted in implied equity values per Company
10 ADS which made the Proposed Consideration appear reasonable. Had these adjustments and
11 assumptions not been made, JP Morgan's analyses would have painted a much different picture for
12 Company shareholders concerning the true value of Focus Media.

13     50.    With respect to its Public Trading Multiples analysis, JP Morgan derived an implied
14 equity value of between $17.58 to $25.85 per Company ADS by applying Firm Value ("FV") /
15 2013 Estimated ("E") Sales multiples ranging from 1.5x to 2.5x to the Company's 2013E Sales
16 figures.[9] This range was selected by JP Morgan based on the FV / 2013E Sales multiples seen in
17 six companies that it believed to be "comparable" to Focus Media.

18     51.    While the true range of FV / 2013E Sales multiples for these entities varied from
19 0.7x to 4.7x, JP Morgan selected a reference range of just 1.5x to 2.5x despite the fact that Focus
20 Media was more comparable to those entities exhibiting higher FV / 2013E Sales multiples than
21 those in the lower ranges. There is a direct, positive correlation between a Company's FV / 2013E
22 Sales multiples and its earnings before interest, taxes, depreciation, and amortization ("EBITDA")
23 margin (a/k/a profit margin) which, based on this strong linear relationship, implies a proper FV /

24 _____

25 [9] Notably, the use of sales multiples is, in and of itself, one way in which financial advisors like JP
26 Morgan can manipulate the results of their financial analyses. This is because sales figures have
   little to do with overall financial performance. Indeed, comparing companies with identical sales
27 but varied profit margins (as JP Morgan did here), is like comparing apples to oranges.

28

1   66.     These statements are rendered misleading by the omissions identified in ¶64

2  because they give a materially incomplete and distorted picture of the sales process and leave

3  Focus Media shareholders unable to determine whether the Board took all steps to maximize

4  shareholder value.  Specifically, these statements and omissions create the misleading impression

5  that the sales process was open to other potential bidders and not slanted entirely in favor of the

6  conflicted defendant Jiang and the other members of the Acquiring Consortium to the exclusion of

7  other value maximizing alternatives.

8  **Inadequate Disclosures Concerning JP Morgan's Financial Analyses**

9   67.     *JP Morgan's Public Trading Multiples Analysis.*  The description of JP Morgan's

10  Public Trading Multiples Analysis on page 41 of the Proxy (as further detailed in the Fairness

11  Presentation) is materially deficient because it fails to disclose the adjustment(s) JP Morgan made

12  to its selection and application of sales multiples to Focus Media, if any, to account for relative

13  differences in profitability between the Company and the so-called "comparable" companies it

14  reviewed in connection with this analysis.

15   68.     The omission of this information renders the following statements in the Proxy false

16  and/or materially misleading:

17          (a)     on pages 30 and 31 of the Proxy, the following related statements:

18  On December 19, 2012, the independent committee held a meeting with Kirkland &
    Ellis, Maples and Calder and J.P. Morgan[ whereat] J.P. Morgan [] made a financial
19  presentation regarding the Company and the consideration that would be paid to the
    Company's shareholders in the potential merger. Thereafter, J.P. Morgan provided its
20  oral opinion, subsequently confirmed in writing and attached hereto as Annex B, to
    the independent committee to the effect that, as of December 19, 2012, and based
21  upon and subject to the various assumptions made, procedures followed, matters
    considered and qualifications and limitations set forth therein, the $5.50 per Share (or
22  $27.50 per ADS) cash merger consideration to be received by the holders of
    Company's Shares and ADSs, respectively (other than holders of Excluded Shares),
23  pursuant to the merger agreement was fair, from a financial point of view, to such
24  holders.

25                              *   *   *

26
27  J.P. Morgan then shared the financial presentation previously given to the
    independent committee regarding the Company and the consideration that would be
28  paid to the Company's holders of Shares and ADSs in the potential merger, and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND
OPPRESSION

1    indicated that the board of directors (other than those members of the board of
     directors who recused themselves from voting on the approval of the merger and the
2    merger agreement) was entitled to rely on the opinion that J.P. Morgan had orally
     provided to the independent committee, as subsequently confirmed in writing, to the
3    effect that, as of December 19, 2012, and based upon and subject to the various
4    assumptions made, procedures followed, matters considered and qualifications and
     limitations set forth therein, the $5.50 per Share (or $27.50 per ADS) cash merger
5    consideration to be received by the holders of Company's Shares and ADSs,
     respectively (other than holders of Excluded Shares), pursuant to the merger
6    agreement was fair, from a financial point of view, to such holders.

7         (b)    on page 41 of the Proxy, the statement:

8    *Public Trading Multiples*

9    Using publicly available information, J.P. Morgan compared selected financial data
10   of the Company with similar data for selected publicly traded companies engaged in
     businesses which J.P. Morgan judged to be most similar to the Company. The
11   companies selected by J.P. Morgan were:

12       • JCDecaux S.A.

13       • Lamar Advertising Company

14       • Clear Channel Outdoor Holdings, Inc

15       • APG|SGA SA

16       • Ströer Out-of-Home Media AG

17       • Clear Media Limited

     These companies were selected, among other reasons, because they represent the
18   main publicly traded peers in the global outdoor advertising industry with operations
     and businesses that, for purpose of J.P. Morgan's analysis, may be considered similar
19   to that of the Company. However, none of the selected companies reviewed is
20   identical to the Company. Accordingly, a complete analysis of the results of the
     following calculations cannot be limited to a quantitative review of such results and
21   involves complex considerations and judgments concerning the differences in the
     financial and operating characteristics of the selected companies compared to the
22   Company's and other factors that could affect the public trading value of the selected
23   companies and the Company.

24   In all instances, multiples were based on closing share prices on December 17, 2012.
     For each of the following analyses performed by J.P. Morgan, estimated financial
25   data for the selected companies were based on the selected companies' filings with
     the SEC and any other relevant stock exchanges as well as the publicly available
26   consensus estimates of Wall Street analysts.

27   In conducting its analyses, J.P. Morgan reviewed the selected companies' trading
28   multiples based on (1) ratio of FV to estimated sales for calendar year 2013, (2) ratio

                                          - 26 -

1    of FV to estimated EBITDA for calendar year 2013, and (3) ratio of market
2    capitalization to estimated net income, referred to as the P/E multiple, for calendar
     year 2013. Results of the analyses were presented for the selected companies, as
3    indicated in the following table:

| Company | FV/Sales 2013E | FV/EBITDA 2013E | P/E 2013E |
|---|---|---|---|
| JCDecaux S.A. | 1.6x | 7.1x | 17.7x |
| Lamar Advertising Company | 4.7x | 10.9x | NM |
| Clear Channel Outdoor Holdings, Inc | 2.2x | 9.5x | NM |
| APG\|SGA SA | 1.6x | 7.3x | 13.2x |
| Ströer Out-of-Home Media AG | 1.1x | 5.8x | 11.8x |
| Clear Media Limited | 0.7x | NA | 9.0x |

8    Based on the above analyses, J.P. Morgan applied a multiple reference range of (1)
     1.5x to 2.5x for FV to the Company's estimated sales for calendar year 2013 based on
9    management estimates, (2) 6.0x to 9.0x for FV to the Company's estimated EBITDA
     for calendar year 2013 based on management estimates, and (3) 9.0x to 12.0x for
10   equity value to the Company's estimated net income for calendar year 2013 based on
     management estimates. In comparison to the per ADS consideration, the analyses
11   indicated the following equity values per ADS:

| FV/Sales 2013E | FV/EBITDA 2013E | P/E 2013E |
|---|---|---|
| $17.58 to $25.85 | $26.79 to $37.51 | $26.01 to $34.59 |

14   69.    These statements are rendered false and/or materially misleading by the omissions

15   identified in ¶67 because, without such information, shareholders are unable to independently

16   assess whether the implied prices per ADS derived by JP Morgan in connection with this analysis

17   are based on an applicable set of companies and multiples. Accordingly, shareholders are unable

18   to independently assess whether JP Morgan's analysis, as set forth in the Proxy, is an adequate

19   measure of this value assessment and what weight, if any, to place on the fairness opinion in

20   deciding how to vote on the Proposed Transaction.[13]

21   70.    *JP Morgan's Selected Transaction Analysis.* The description of JP Morgan's

22   Selected Transaction Analyses on pages 41-42 of the Proxy (as further detailed in the Fairness

23   Presentation) is materially deficient because it fails to disclose the adjustment(s) JP Morgan made

24   to its selection and application of sales multiples to Focus Media, if any, to account for relative

26   [13] *See supra* at 16-20 for a discussion as to how JP Morgan manipulated its Public Trading
27   Multiples analysis to create the false impression that the Proposed Consideration was fair.

- 27 -

1  differences in profitability between the Company and the target companies it reviewed in

2  connection with this analysis.

3      71.    The omission of this information renders the following statements in the Proxy false

4  and/or materially misleading:

5          (a)    on pages 30 and 31 of the Proxy, the following related statements:

6  On December 19, 2012, the independent committee held a meeting with Kirkland &
   Ellis, Maples and Calder and J.P. Morgan[ whereat] J.P. Morgan [] made a financial
7  presentation regarding the Company and the consideration that would be paid to the
   Company's shareholders in the potential merger. Thereafter, J.P. Morgan provided its
8  oral opinion, subsequently confirmed in writing and attached hereto as Annex B, to
   the independent committee to the effect that, as of December 19, 2012, and based
9  upon and subject to the various assumptions made, procedures followed, matters
10 considered and qualifications and limitations set forth therein, the $5.50 per Share (or
   $27.50 per ADS) cash merger consideration to be received by the holders of
11 Company's Shares and ADSs, respectively (other than holders of Excluded Shares),
   pursuant to the merger agreement was fair, from a financial point of view, to such
12 holders.

13                                    *   *   *

14
15 J.P. Morgan then shared the financial presentation previously given to the
   independent committee regarding the Company and the consideration that would be
16 paid to the Company's holders of Shares and ADSs in the potential merger, and
   indicated that the board of directors (other than those members of the board of
17 directors who recused themselves from voting on the approval of the merger and the
18 merger agreement) was entitled to rely on the opinion that J.P. Morgan had orally
   provided to the independent committee, as subsequently confirmed in writing, to the
19 effect that, as of December 19, 2012, and based upon and subject to the various
   assumptions made, procedures followed, matters considered and qualifications and
20 limitations set forth therein, the $5.50 per Share (or $27.50 per ADS) cash merger
   consideration to be received by the holders of Company's Shares and ADSs,
21 respectively (other than holders of Excluded Shares), pursuant to the merger
   agreement was fair, from a financial point of view, to such holders.

22
23         (b)    on pages 41-42 of the Proxy, the statement:

24 *Selected Transaction Analysis*

25 J.P. Morgan conducted an analysis of selected transactions in the advertising
   industry. For each of the selected transactions, J.P. Morgan calculated, to the extent
26 information was publicly available, (1) FV of the company divided by the company's
   sales for the twelve-month period immediately preceding the announcement of the
27 respective transaction, or "LTM FV/ Sales," (2) FV of the company divided by the
   company's EBITDA for the twelve-month period immediately preceding the
28 announcement of the respective transaction, or "LTM FV/ EBITDA". The

                                    - 28 -

transactions considered the month and year each transaction was announced; the resulting LTM FV/ Sales and LTM FV/ EBITDA are as follows:

| Announcement date | Target | Acquirer | LTM FV/Sales | LTM FV/ EBITDA |
|---|---|---|---|---|
| July 20, 2012 | Eye Corp Pty Limited | CHAMP Private Equity | 0.8x | NA |
| October 24, 2011 | Mediakiosk | JCDecaux S.A. | 2.3x | 5.7x |
| Feb 28, 2008 | Vista Media Group | Lamar Advertising Company | 1.8x | 22.6x |
| August 31, 2007 | Primesight Limited | GMT Communications Partners | NA | 8.0x |
| April 23, 2007 | Affichage Holding | Compagnie Nationale à Portefeuille S.A. | 1.5x | 7.7x |

Based on the results of this analysis and other factors that J.P. Morgan considered appropriate, J.P. Morgan applied a LTM FV/ Sales multiple of 1.0x to 2.5x to the Company's estimated sales for the twelve-month period ended September 30, 2012; J.P. Morgan applied a LTM FV/ EBITDA multiple of 6.0x to 8.0x to the Company's estimated EBITDA for the twelve-month period ended September 30, 2012. In comparison to the per ADS consideration, the analyses indicated the following equity values per ADS:

| LTM FV/Sales | LTM FV/EBITDA |
|---|---|
| $12.04 to $22.35 | $23.67 to $29.81 |

72.     These statements are rendered false and/or materially misleading by the omissions identified in ¶70 because, without such information, shareholders are unable to independently assess whether the implied prices per ADS derived by JP Morgan in connection with this analysis are based on an applicable set of transactions and multiples. Accordingly, shareholders are unable to independently assess whether JP Morgan's analysis, as set forth in the Proxy, is an adequate measure of this value assessment and what weight, if any, to place on the fairness opinion in deciding how to vote on the Proposed Transaction.[14]

73.     **JP Morgan's DCF Analysis.** The description of JP Morgan's DCF Analysis on page 42 of the Proxy (as further detailed in the Fairness Presentation) is materially deficient because it fails to disclose:

(a)     the range of implied terminal EBITDA multiples derived by JP Morgan in its analysis or, in the alternative, the range of terminal values calculated;

---

[14] *See supra* at 16-20 for a discussion as to how JP Morgan manipulated its Selected Transaction Analysis to create the false impression that the Proposed Consideration was fair.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND OPPRESSION

1 | 2013E Sales multiple for Focus Media of around 3.5x – considerably more than even the upper end
2 | of the reference range used by JP Morgan in its analysis.

3 |      52.    Had JP Morgan used a more appropriate range of FV / 2013E Sales multiples in its
4 | Public Trading Multiples analysis, a more accurate implied equity value range per Focus Media
5 | ADS that would have been considerably higher than the $17.58 to $25.85 per ADS range
6 | contained in JP Morgan's fairness opinion would have been derived. This would materially alter
7 | Focus Media shareholder's evaluation concerning the adequacy of the Proposed Consideration as a
8 | whole.

9 |      53.    JP Morgan manipulated its Selected Transaction Analysis in much the same way as
10 | it did its Public Trading Multiples analysis. By failing to give greater weight to the FV / Last
11 | Twelve Months ("LTM") Sales multiples for the acquired companies with profit margins that were
12 | similar to Focus Media's, JP Morgan was able to lower the range of implied equity values per ADS
13 | to make the Proposed Consideration being offered by the Acquiring Consortium seem better than
14 | it actually is.

15 |      54.    Further undermining the integrity of the Selected Transactions Analysis is the fact
16 | that the five so-called "precedent transactions" used by JP Morgan are severely lacking in terms of
17 | the qualities financial advisors normally look to when deciding whether a transaction is a good
18 | comparable for purposes of this type of analysis. Indeed, three of the transactions occurred five or
19 | more years ago – before the recent economic crisis uprooted the financial markets – and two of
20 | them were acquisitions of less than a 100% interest in the acquired company with one of them not
21 | even being a controlling acquisition. Accordingly, it is questionable whether the implied equity
22 | values per Company ADS derived by JP Morgan in its Selected Transaction Analysis warrant any
23 | legitimate consideration at all.

24 |      55.    Finally, JP Morgan manipulated its DCF Analysis in a variety of ways. First, it
25 | used implied perpetuity growth rates rather than terminal EBITDA multiples in calculating Focus
26 | Media's "terminal value." Second, it made a series of questionable assumptions in connection with
27 | its calculation of the projected free cash flows for the Company through the terminal period.
28 | Lastly, it relied on certain unjustifiable data points in order to derive the discount rate range used.

1 The negative effects of these decisions on the ultimate equity value per Company ADS derived in
2 the DCF Analysis were dramatic.

3     56.     In calculating the terminal value for the Company, JP Morgan used the Gordon
4 Growth Model formula[10] with a perpetual growth rate range of 2% to 4%. This implies a terminal
5 EBITDA multiple of around 3.3x – much lower than the average for comparable companies.
6 Accordingly, by choosing to use the Gordon Growth Model, JP Morgan was able to mask the fact
7 that it was relying on a below-average terminal EBITDA multiple and, consequently, drive down
8 the ultimate equity value per Focus Media ADS derived in the DCF Analysis.

9     57.     JP Morgan's projected free cash flow calculations further contain certain
10 questionable and seemingly unjustified assumptions which negatively impacted the annual
11 unlevered free cash flow forecasts used in the DCF Analysis.[11] For instance, JP Morgan assumes
12 that the Company's tax rate will increase from 17% to 28% between 2012 and 2017 (and through
13 the terminal year), however, it does not appear there is any basis for this dramatic increase.
14 Similarly, JP Morgan claims that the Company's annual share-based compensation expense will
15 increase by over 45% from 2013 ($72 million) to 2017 ($105 million). If true, this would imply
16 that the Company would be issuing nearly one-fifth of its then outstanding shares to insiders in
17 2017 alone. Giving away this much equity on an annual basis is neither reasonable nor
18 sustainable. Indeed, with average stock-based compensation expenses ranging from 1-3% of the
19 annual free cash flows for conservative companies (and only 5-7% for hyper-growth type entities)
20 it is clear that the stock-based compensation assumptions made by JP Morgan are completely
21 unrealistic. Collectively, these faulty assumptions decreased the implied equity values per

22

23

24 [10] Under the Gordon Growth Model, an entity's terminal value is calculated by: (i) multiplying the
cash flow number for the last year in the projections by 1+ the long-term growth rate chosen for
25 the entity; (ii) subtracting the long-term growth rate chosen for the entity from the chosen discount
rate; and (iii) dividing the number calculated in (i) by the number calculated in (ii).

26 [11] These calculations/figures are contained in JP Morgan's presentation to independent directors on
27 December 19, 2012 (the "Fairness Presentation") which is attached as Exhibit (c)-(2) to the Proxy.

28

- 19 -

1  Company ADS derived in the DCF Analysis by artificially decreasing the underlying free cash
2  flow figures upon which those values are based.

3      58.     In addition, JP Morgan also utilized an overly conservative discount rate range in
4  its DCF Analysis which artificially lowered the implied equity value of the Company on a per
5  ADS basis. As with terminal values, there are a number of ways to derive a discount rate for use
6  in a DCF analysis, including, as JP Morgan did, by calculating the weighted average cost of capital
7  ("WACC") for the entity being valued. Here, JP Morgan calculated a discount rate range of 14%
8  to 18% for the Company based on a WACC analysis. A review of the inputs underlying this
9  calculation reveal several fundamental flaws suggesting that the ultimate discount rates used in the
10  analysis were higher than what would generally be considered appropriate.

11      59.     First, JP Morgan adds a 1.6% country risk premium to its calculation of the
12  discount rate without providing a source/basis for using this figure. Indeed, there is absolutely no
13  justification provided in the Fairness Presentation for using this figure. More importantly,
14  however, JP Morgan adds an 8% to 9% equity risk premium to the discount rate calculation. This
15  is beyond excessive. Indeed, a risk premium of between 4% and 6% is generally deemed
16  acceptable but 8% to 9% is unsustainably high. Accordingly, it is no surprise that JP Morgan
17  provides no source or other form of justification for its decision to use this excessive equity risk
18  premium range. Because an increase in the discount rate used in a DCF Analysis results in a
19  decrease in the implied equity value of the given entity (and vice-versa), JP Morgan's decision to
20  use an inflated discount rate further created the false impression that Focus Media was worth less
21  than it actually was and, consequently, that the Proposed Consideration was reasonable.

22      60.     Collectively, these deceptive tactics used by JP Morgan in connection with the
23  preparation of the financial analyses underlying its fairness opinion demonstrate just how
24  inadequate the Proposed Consideration being offered by the Acquiring Consortium truly is. Had
25  the Proposed Consideration been more in line with the actual intrinsic value of the Company, JP
26  Morgan would not have had to go to such great lengths to make it appear reasonable.

27
28

**SELF-DEALING**

61.     Because the Individual Defendants dominate and control the business and corporate affairs of Focus Media and have access to material, non-public information concerning Focus Media's financial condition and business prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Focus Media. Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any merger or acquisition under which they will reap disproportionate benefits to the exclusion of obtaining the best shareholder value reasonably available. Nonetheless, the Proposed Transaction represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of the Class (as defined herein) by denying the Class members their shareholders' rights by selling Focus Media via an unfair process and at an inadequate price. Accordingly, the Proposed Transaction will benefit the Individual Defendants at the expense of Focus Media shareholders.

62.     Instead of attempting to negotiate an agreement reflecting the best consideration reasonably available for Focus Media shareholders who they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Transaction to meet their own personal needs and objectives by agreeing to sell the Company to a buyer that would retain members of the Company's Board going forward. Indeed, concurrently with the execution of the Merger Agreement, certain of the Defendants entered into agreements pursuant to which they will retain an equity interest in the post-transaction company, thereby allowing them to "enjoy [the] benefits from future earnings and growth of the surviving company" – a benefit which is not shared equally by Plaintiff and the other common shareholders of Focus Media. Defendant Jiang will continue to serve as CEO and Chairman of the board of directors of the surviving company, thereby maintaining the lucrative benefits of his employment package and participating in the financial growth of the Company.

**THE MATERIALLY MISLEADING PROXY**

63.     In order to secure shareholder approval of this unfair deal, Defendants filed the false and materially misleading Proxy with the SEC on January 18, 2013. The Proxy

- 21 -

1  misrepresents and/or omits material information necessary for Focus Media shareholders to make
2  an informed decision regarding whether to vote in favor of the Proposed Transaction or seek
3  appraisal of their shares. Specifically, as set forth below, Defendants fail to provide Company
4  shareholders with material information and/or provide them with materially misleading
5  information concerning: (i) the unfair sales process resulting in the Proposed Transaction; and (ii)
6  the true intrinsic value of the Company as derived in the financial analyses performed by JP
7  Morgan in connection with the rendering of its fairness opinion.

8  **Inadequate Disclosures Concerning the Sales Process**

9       64.     With respect to the process that led to the Proposed Transaction, the Background of
10  the Merger section contained on pages 24-31 of the Proxy is materially deficient in that it fails to
11  disclose:

12              (a)     why, on August 12, 2012, defendant Jiang decided to enter in a year-long
13  exclusive consortium agreement with the Sponsor Group knowing that it would effectively lock
14  any other potential parties interested in a going-private transaction out of contention, thereby
15  limiting the possibility of a competitive sales process designed to maximize shareholder value;

16              (b)     why, on August 14, 2012, Fosun issued a press release stating that it would
17  not likely support any competing proposals to acquire the Company unless they included the
18  Chairman as a participant – especially given that, at that point, Fosun was to be cashed out in any
19  such acquisition and therefore had no interest in who ultimately obtained control over the
20  Company;

21              (c)     the rationale for Fosun's decision to issue its August 14, 2012 press release
22  given that defendant Jiang had previously agreed to work exclusively with the Sponsor Group and,
23  therefore, could not work with any other potential acquirers; and

24              (d)     the basis for the Special Committee's determination that $5.70 per share (or
25  $28.50 per ADS) was an adequate basis upon to sell the Company as evidenced by its October 3,
26  2012 counter-proposal to the Acquiring Consortium.

27       65.     The omission of this information makes the following statements in the Proxy false
28  and/or materially misleading:

- 22 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND
OPPRESSION

(a)     in defendant Jiang's letter to Focus Media in the introduction of the Proxy,

the following related statements:

An independent committee of the board of directors of the Company, composed solely of directors unrelated to the management of the Company, the Consortium, Holdco, Parent or Merger Sub, reviewed and considered the terms and conditions of the merger agreement and the transactions contemplated by the merger agreement, including the merger. The independent committee unanimously (a) determined that the merger agreement is fair to and in the best interests of, the Company and its unaffiliated security holders....

On December 19, 2012, the board of directors of the Company (with the Chairman abstaining), after carefully considering all relevant factors, including the unanimous determination and recommendation of the independent committee, (a) determined that it is fair to and in the best interests of the Company and its unaffiliated security holders, and declared it advisable, to enter into the merger agreement....

After careful consideration and upon the unanimous recommendation of the independent committee of the board of directors of the Company, the Company's board of directors (with the Chairman abstaining) authorized and approved the merger agreement and recommends that you vote FOR the proposal to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received to pass the special resolution during the extraordinary general meeting.[12]

(b)     on page 25 of the Proxy, the statement:

On August 12, 2012, the Sponsor Group and the Chairman and certain controlled affiliates of the Chairman signed a consortium agreement, pursuant to which the Chairman and the Sponsor Group agreed to participate, on an exclusive basis for 12 months following the date of the consortium agreement, in a potential going private transaction involving the Company, and submitted to the board of directors of the Company a preliminary non-binding proposal (the "Proposal Letter") to acquire the Company in a going private transaction for $5.40 in cash per Share (or $27.00 in cash per ADS), other than any Shares or ADSs beneficially held by the Chairman and his controlled affiliated entities that may be rolled over in connection with the proposed acquisition (the "Proposal").

(c)     On pages 26 and 27 of the Proxy, the following related statements:

---

[12] Similar statements are repeated again later in the introduction and on pages 5, 8, and 18 of the Proxy.

- 23 -

Also on August 14, 2012, Fosun, which at that time was not yet a member of the Consortium, issued a press release indicating, among other things, that, while it had not made any commitment with respect to the going private proposal, it did not anticipate supporting any competing proposal not including the Chairman as a participant.

\* \* \*

On September 14, 2012, at J. P. Morgan's request, Fosun had a telephonic meeting with J. P. Morgan. During the meeting, Fosun confirmed that, while it had not decided if it would support the pending going private proposal, it would not support any competing proposals not including the Chairman as a participant. Fosun also advised J.P. Morgan that it was not at that time prepared to join the Consortium and that it was continuing to evaluate the terms of the going private proposal.

(d)     on pages 28 and 29 of the Proxy, the following related statements:

On October 3, 2012, the independent committee convened a telephonic meeting with Kirkland & Ellis and J.P. Morgan. After Kirkland & Ellis provided the independent committee with an update on its discussions with Fried Frank regarding transaction structure and certainty of closing, J.P. Morgan then provided the independent committee with an overview of China's outdoor advertising market and an update on the status of due diligence on the Company's financial projections provided by management. Kirkland & Ellis then provided the independent committee with a detailed overview of the draft merger agreement. After a lengthy discussion with its advisors regarding the merger agreement and the Consortium's offer price, the independent committee instructed Kirkland & Ellis to prepare comments to the merger agreement and J.P. Morgan to ask the Consortium to increase its offer price to $5.70 in cash per Share (or $28.50 in cash per ADS).

\* \* \*

On November 16, 2012, the independent committee and representatives of Carlyle, FountainVest, Party A, J.P. Morgan, Kirkland & Ellis and Fried Frank met in Shanghai, with representatives of Sullivan & Cromwell participating by conference call, in order to discuss the merger agreement and open issues, including, among other things, the offer price increase previously requested by the independent committee and whether the Company would be permitted to continue to pay dividends according to its previously announced dividend policy, the amount of the termination fees, the extent to which the transaction may be conditioned upon the SEC Inquiry and the Consortium's proposed debt and equity financing arrangements, including the possibility that the Consortium might add additional equity providers to the Consortium. During this meeting, the Consortium suggested the possibility of raising the offer price to $5.60 per Share in cash (or $28.00 per ADS in cash), but conditioned any such price increase on, in addition to the resolution of other open issues, the Company immediately suspending its previously announced dividend policy.

1          (b)    the source(s) used by JP Morgan to derive the 8% to 9% range of equity risk

2  premiums used in calculating the discount rate range applied in the analysis;

3          (c)    the source(s) used by JP Morgan to derive the 1.6% country risk premium

4  used in calculating the discount rate range applied in the analysis;

5          (d)    the projected Company shares outstanding for each of the forecast years of

6  2012 through 2017; and

7          (e)    the rationale for the significant increases in taxes relative to EBIT in the

8  year 2015 (increasing from 18% to 23%) and 2017 (increasing again from 23% to 28%).

9      74.    The omission of this information renders the following statements in the Proxy false

10  and/or materially misleading:

11          (a)    on pages 30 and 31 of the Proxy, the following related statements:

On December 19, 2012, the independent committee held a meeting with Kirkland & Ellis, Maples and Calder and J.P. Morgan [whereat] J.P. Morgan [] made a financial presentation regarding the Company and the consideration that would be paid to the Company's shareholders in the potential merger. Thereafter, J.P. Morgan provided its oral opinion, subsequently confirmed in writing and attached hereto as Annex B, to the independent committee to the effect that, as of December 19, 2012, and based upon and subject to the various assumptions made, procedures followed, matters considered and qualifications and limitations set forth therein, the $5.50 per Share (or $27.50 per ADS) cash merger consideration to be received by the holders of Company's Shares and ADSs, respectively (other than holders of Excluded Shares), pursuant to the merger agreement was fair, from a financial point of view, to such holders.

*  *  *

J.P. Morgan then shared the financial presentation previously given to the independent committee regarding the Company and the consideration that would be paid to the Company's holders of Shares and ADSs in the potential merger, and indicated that the board of directors (other than those members of the board of directors who recused themselves from voting on the approval of the merger and the merger agreement) was entitled to rely on the opinion that J.P. Morgan had orally provided to the independent committee, as subsequently confirmed in writing, to the effect that, as of December 19, 2012, and based upon and subject to the various assumptions made, procedures followed, matters considered and qualifications and limitations set forth therein, the $5.50 per Share (or $27.50 per ADS) cash merger consideration to be received by the holders of Company's Shares and ADSs, respectively (other than holders of Excluded Shares), pursuant to the merger agreement was fair, from a financial point of view, to such holders.

- 30 -

1          (b)    on page 42 of the Proxy, the statement:

2     *Discounted Cash Flow Analysis*

3          J.P. Morgan conducted a discounted cash flow analysis for the purpose of
       determining the diluted equity value per ADS for the ADSs. J.P. Morgan calculated
4      the unlevered free cash flows that the Company is expected to generate during the
       fourth quarter of 2012 through fiscal years 2013 to 2017 based upon financial
5      projections prepared by the management of the Company. J.P. Morgan also
       calculated a range of terminal asset values of the Company at the end of the
6      projection period ending 2017 by applying a perpetual growth rate ranging from 2%
7      to 4%. The unlevered free cash flows and the range of terminal asset values were
       then discounted to present values using a range of discount rates from 14% to 18%,
8      which were chosen by J.P. Morgan based upon an analysis of the weighted average
       cost of capital of the Company. The present value of the unlevered free cash flows
9      and the range of terminal asset values were then adjusted by subtracting total debt
10     outstanding as of September 30, 2012, adding total cash and cash equivalents
       outstanding as of September 30, 2012, subtracting minority interests and adding
11     equity interests. Based on these assumptions, the discounted cash flow analysis
       indicated a range of per ADS equity values of between \$22.35 and \$31.17.
12

13         75.    These statements are rendered false and/or materially misleading by the omissions

14  identified in ¶73 because DCF analyses are very sensitive to the inputs used, specifically the

15  EBITDA multiples and discount rates selected to calculate. Accordingly, this information is

16  critical to shareholders' understanding of how the DCF Analysis was performed, whether it was

17  performed properly, and in turn, what weight, if any, to place on JP Morgan's DCF Analysis (and

18  its fairness opinion as a whole) when determining whether to vote for the Proposed Transaction.[15]

19  **Inadequate Disclosures JP Morgan's Prior Business Relationships**

20         76.    With respect to JP Morgan's retention, the Proxy is materially deficient in that it

21  fails to disclose the specific services JP Morgan has provided to the various parties involved in the

22  Proposed Transaction, and/or any of those parties' respective affiliates, in the last two years and the

23  amount of compensation received for the rendering of such services.

24

25

26  [15] *See supra* at 16-20 for a discussion as to how JP Morgan manipulated its DCF Analysis to create
27  the false impression that the Proposed Consideration was fair.

28

                                          - 31 -

77.    The omission of this information makes the following related statements on pages 42-43 of the Proxy false and/or materially misleading:

> As a part of its investment banking business, J.P. Morgan and its affiliates are continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, investments for passive and control purposes, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements, and valuations for estate, corporate and other purposes. J.P. Morgan was selected to deliver an opinion to the independent committee with respect to the merger on the basis of such experience and its familiarity with the Company.
>
> Under the terms of J.P. Morgan's engagement and for its service, the Company has agreed to pay J.P. Morgan (1) a fee of $2 million upon delivery of the Opinion, (2) an additional fee of $500,000, payable upon closing of the merger, and (3) a discretionary fee of $500,000, payable in the sole discretion of the independent committee upon closing of the merger. In addition, the Company has agreed to reimburse J.P. Morgan for its expenses incurred in connection with its services, including the fees and disbursements of outside legal counsel engaged by J.P. Morgan in connection with its performance of services hereunder. The Company has also agreed to indemnify J.P. Morgan for certain liabilities arising out of J.P. Morgan's engagement.
>
> In addition, during the two years preceding the date of J.P. Morgan's opinion, J.P. Morgan and its affiliates have had, and may continue to have in the future, commercial and/or investment banking relationships with the Company and affiliates of certain members of the Consortium, for which J.P. Morgan and such affiliates have received and may in the future receive customary compensation. Such services for the Company and affiliates of certain members of the Consortium during such period have included providing or arranging debt and equity financing, M&A advisory services, treasury and securities services and asset and wealth management services to affiliates of certain members of the Consortium. In addition, our commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of affiliates of certain members of the Consortium, for which it receives customary compensation or other financial benefits. In the ordinary course of their businesses, J.P. Morgan and its affiliates may actively trade the debt and equity securities of the Company for their own accounts or for the accounts of customers and, accordingly, they may at any time hold long or short positions in such securities.

78.    These statements are rendered false and/or materially misleading by the omissions identified in ¶76 as JP Morgan's incentives and potential conflicts of interest associated with the rendering of a fairness opinion and having the Proposed Transaction consummated on a timely basis will impact the weight, if any, that that shareholders place on that fairness opinion in deciding how to vote on the Proposed Transaction.

1    79.    Defendants' failure to provide Focus Media shareholders with the foregoing
2 material information constitutes a violation of sections 14(a) and 20(a) of the Exchange Act, and
3 SEC Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to
4 disclose this information, and acted with at least negligence in failing to include it in the Proxy.
5 Absent disclosure of this material information prior to the vote on the Proposed Transaction,
6 Company shareholders will be unable to make an informed decision about whether to vote in favor
7 of the Proposed Transaction and are thus threatened with irreparable harm warranting the
8 injunctive relief sought herein.

9                        **CLASS ACTION ALLEGATIONS**

10   80.    Plaintiff brings this action for itself and on behalf of all holders of Focus Media
11 common stock which have been or will be harmed by the conduct described herein (the "Class").
12 Excluded from the Class are the defendants and any individual or entity affiliated with any
13 Defendant.

14   81.    This action is properly maintainable as a class action.

15   82.    The Class is so numerous that joinder of all members is impracticable. According
16 to Focus Media's SEC filings, there were more than 660 million ordinary shares of Focus Media
17 common stock outstanding as of January 17, 2013.

18   83.    There are questions of law and fact which are common to the Class and which
19 predominate over questions affecting any individual Class member, including:

20            (a)    whether the Proxy contains material misstatements or omissions in violation
21 of sections 14(a) and 20(a) of the Exchange Act;

22            (b)    whether the Individual Defendants have oppressed Focus Media
23 shareholders in connection with the Proposed Transaction by: (i) failing to take steps to maximize
24 the value of Focus Media to its public shareholders; (ii) failing to properly value Focus Media and
25 its various assets and operations; and/or (iii) ignoring and not protecting Focus Media shareholders
26 against the numerous conflicts of interest;

27
28
                                        - 33 -
     CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND
                                      OPPRESSION

1        (c)    whether the Individual Defendants have breached any of their obligations

2  and/or duties owed to Plaintiff and the other members of the Class in connection with the Proposed

3  Transaction;

4        (d)    whether the Individual Defendants are conflicted, engaged in self-dealing, or

5  have otherwise unjustly enriched themselves or the other insiders/affiliates of Focus Media in

6  connection with the Proposed Transaction;

7        (e)    whether the Individual Defendants, in bad faith and for improper motives,

8  impeded or erected barriers designed to discourage other potentially interested parties from making

9  an offer to acquire the Company or its assets;

10       (f)    whether any of the Defendants aided and abetted any of the Board's

11  breaches of duty owed to Plaintiff and other members of the Class in connection with the Proposed

12  Transaction; and

13       (g)    whether Plaintiff and the other members of the Class would suffer

14  irreparable injury were the Proposed Transaction consummated without the wrongdoing

15  complained of herein being corrected.

16     84.    Plaintiff's claims are typical of the claims of the other members of the Class and

17  Plaintiff does not have any interests adverse to the Class.

18     85.    Plaintiff has retained competent counsel experienced in litigation of this nature and

19  will fairly and adequately represent and protect the interests of the Class.

20     86.    The prosecution of separate actions by individual members of the Class would

21  create a risk of inconsistent or varying adjudications with respect to individual members of the

22  Class which would establish incompatible standards of conduct for the party opposing the Class.

23     87.    Plaintiff anticipates that there will be no difficulty in the management of this

24  litigation. Indeed, a class action is superior to other available methods for the fair and efficient

25  adjudication of this controversy.

26     88.    Defendants have acted on grounds generally applicable to the Class with respect to

27  the matters complained of herein, thereby making appropriate the relief sought with respect to the

28  Class as a whole.

## COUNT I

**Against the Individual Defendants, Focus Media, and Giovanna for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     The Individual Defendants, Focus Media, and Giovanna disseminated the false and materially misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants, Focus Media, and Giovanna.  It misrepresented and/or omitted material facts, including material information about the sales process and the actual intrinsic value of the Company.

92.     The Individual Defendants, Focus Media, and Giovanna were at least negligent in filing the Proxy with these false and materially misleading statements.

93.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

94.     By reason of the foregoing, the Individual Defendants, Focus Media, and Giovanna have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

95.     Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

- 35 -

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of Focus Media within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Focus Media, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

98.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy, and other statements alleged by Plaintiff to be misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

100.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the directors.

101.     By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

- 36 -

1     102.   As set forth above, the Individual Defendants had the ability to exercise control

2 over, and did control, a person or persons who have each violated section 14(a) and SEC Rule 14a-

3 9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons,

4 these Defendants are liable pursuant to section 20(a) of the Exchange Act.

5 **COUNT III**

6 **Against the Individual Defendants for Oppression Pursuant to**
**Section 92(e) of the Companies Law**

7

8     103.   Plaintiff repeats and realleges each and every allegation contained above as if fully

9 set forth herein.

10     104.   Section 92, *et seq.*, of the Companies Law, allows shareholders (a/k/a

11 contributories) to present the court with an application to wind up a company when they believe

12 the affairs of the corporation are being conducted in, or the powers of the directors are being

13 exercised in, a manner detrimental to them or the other contributories. Upon such application, the

14 court must determine whether, in its opinion, it is "just and equitable" to wind up the company at

15 that time.

16     105.   Following the hearing on a winding up petition, the court has the jurisdiction to

17 make any number of orders it thinks fit to resolve the matter at hand. Specifically, the court has

18 the authority to, among other things, regulate the future conduct of the company, prohibit the

19 company from continuing to act in a given manner, cancel or vary any transaction, mandate the

20 purchase of the shares of any members of the company by other members of the company or the

21 company itself and, in the case of purchase by the company, order the company's capital be

22 reduced accordingly.

23     106.   As demonstrated by the allegations above, the Individual Defendants have acted in

24 a manner which is detrimental, or otherwise oppressive, to the shareholders of Focus Media

25 because, among other reasons they:

26         (a)   failed to take steps to maximize the value of Focus Media to its public

27 shareholders;

28

- 37 -

1        (b)    failed to properly value Focus Media and its various assets and operations;

2  and

3        (c)    ignored or did not protect against the numerous conflicts of interest resulting

4  from the directors' own interrelationships or connection with the Proposed Acquisition.

5       107.    As a result of the Individual Defendants' detrimental, oppressive, and unlawful

6  actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will

7  not receive their fair portion of the value of Focus Media assets and operations. Accordingly, the

8  Individual Defendants are liable under Section 92(e), *et seq.*, of the Companies Law.

9                    **PRAYER FOR RELIEF**

10      WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class

11  and against Defendants as follows:

12     A.    Declaring that this action is properly maintainable as a class action;

13     B.    Declaring and decreeing that the Merger Agreement was agreed to in breach of the

14  duties and obligations of the Individual Defendants and is therefore unlawful and unenforceable;

15     C.    Declaring and decreeing that Defendants have acted and are acting in an oppressive

16  manner with respect to the Company's shareholders;

17     D.    Rescinding, to the extent already implemented, the Merger Agreement;

18     E.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in

19  concert with them from consummating the Proposed Transaction, unless and until the Company:

20  (i) adopts and implements a procedure or process reasonably designed to provide the best possible

21  value for the Class; and (ii) amends the Proxy so as to provide Focus Media shareholders with all

22  material information concerning the Proposed Transaction as required by the Exchange Act;

23     F.    Directing the Individual Defendants to exercise their duties to commence a sales

24  process that is reasonably designed to secure the best possible consideration for Focus Media and

25  obtain a transaction which is in the best interests of the Company's shareholders;

26     G.    Imposition of a constructive trust, in favor of Plaintiff and the other members of the

27  Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

28

1    H.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

2  attorneys' and experts' fees; and

3    I.    Granting such other and further equitable relief as this Court may deem just and

4  proper.

5                                   **JURY DEMAND**

6          Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on

7  all issues so triable.

8    Dated: February 22, 2013                    ROBBINS ARROYO LLP
                                                 BRIAN J. ROBBINS
9                                                STEPHEN J. ODDO
                                                 ARSHAN AMIRI
10                                               EDWARD B. GERARD
                                                 JUSTIN D. RIEGER
11

12                                               _Stephen J. Oddo / Joz_
                                                       STEPHEN J. ODDO
13
                                                 600 B Street, Suite 1900
14                                               San Diego, CA 92101
                                                 Telephone: (619) 525-3990
15                                               Facsimile: (619) 525-3991
                                                 brobbins@robbinsarroyo.com
16                                               soddo@robbinsarroyo.com
                                                 aamiri@robbinsarroyo.com
17                                               egerard@robbinsarroyo.com
                                                 jrieger@robbinsarroyo.com
18
                                                 ROBEIN, URANN, SPENCER, PICARD &
19                                               CANGEMI APLC
                                                 MARIA CANGEMI
20                                               CHRISTINA CARROLL
                                                 2540 Severn Avenue, Suite 400
21                                               Metairie, LA 70002
                                                 Telephone: (504) 885-9994
22                                               Facsimile: (504) 885-9969
                                                 mcangemi@ruspclaw.com
23                                               ccarroll@ruspclaw.com

24                                               THE WARNER LAW FIRM
                                                 PAUL T. WARNER
25                                               11123 McCracken Lane, Suite A
                                                 Cypress, TX 77429
26                                               Telephone: (281) 664-7777
                                                 Facsimile: (281) 664-7774
27                                               pwarner@warner-law.net

28                                               Attorneys for Plaintiff

                                          - 39 -

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Iron Workers Mid-South Pension Fund ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

    1.    Plaintiff has reviewed the Class Action Complaint and has retained Robbins Arroyo LLP as counsel in this action for all purposes.

    2.    Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

    3.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| FMCN | SALE | 335 | 1/24/13 | $24.96 |
| FMCN | SALE | 75 | 1/24/13 | $24.20 |
| FMCN | SALE | 190 | 1/24/13 | $24.61 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

    4.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

    5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: _____

#### MOLYCORP

    6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

    7.    Plaintiff represents and warrants that it is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22d day of February, 2013.

CHRISTINA CARROLL
Counsel for Iron Workers Mid-South
Pension Fund